**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  5:13CR513 |
| | ) | 5:14CR163 |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | |
| | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| DIERE DEJOURNETT, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

The superseding indictment in Case No. 5:13CR513 charges defendants with participating in an extensive drug trafficking conspiracy. All ten (10) defendants have been charged with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 21 U.S.C. § 846. Defendant Diere DeJournett is also charged with possession of a firearm while under a disability, in violation of 18 U.S.C. § 922(g)(1), and concealment and attempted concealment of drug proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (2). (Superseding Indictment, Doc. No. 18.) In a related case—Case No. 5:14CR163—defendant Durvelle Turner, Jr. is charged with one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); and one count of felon in possession of a weapon, in violation of 18 U.S.C. §§ 922(a)(1) and 924(a)(2). (Case No. 5:14CR163, Indictment, Doc. No. 1.) Upon motion of defendant Durvelle Turner, Jr., case number 5:14CR163 was consolidated with case number 5:13CR513 on June 13, 2014.

Pursuant to the Court's Amended Trial Order, defendants and the government filed a series of pre-trial motions. The Court conducted a hearing on all of the pre-trial motions, in both cases, on June 27, 2014. Upon representations from the government that it has already and will continue to honor its discovery obligations, defendants withdrew their discovery-related motions. (*See* Minutes June 27, 2014.) At the conclusion of the hearing, the Court announced its ruling on the government's motion to qualify its expert, and took the remaining motions under advisement. This Opinion and Order shall memorialize its oral ruling on the government's motion and resolve the remaining pre-trial motions. Specifically, the Court shall address herein: the government's motion to qualify DEA S.A. Daniel Wehrmeyer as an expert (Doc. No. 112); the motions of DeJournett and Noel to suppress intercepted communications (Doc. Nos. 122 and 142, respectively); and DeJournett's motion to suppress evidence seized during government searches. (Doc. No. 123.) With respect to Case No. 5:14CR163, the Court will also address defendant Turner's motion to suppress. (Doc. No. 7.)

**A. Defendant DeJournett's Motion to Suppress (Doc. No. 123) and Defendant Turner's Motion to Suppress (Case No. 5:14CR163, Doc. No. 7)**

Defendant DeJournet seeks to suppress all evidence seized from three locations: (1) 55 Shiawassee Ave, Suite 8 AKA FI, Fairlawn, Ohio; (2) 55 Shiawassee Ave., Easternmost Suite on the south side of the building; and (3) 2740 Foxwood Drive, Bath, Ohio, owing to what he perceives as insufficiencies in the warrants and Master Affidavit offered in support of the warrants. Specifically, DeJournett argues that: (1) the Master Affidavit lacked the requisite nexus between the places to be searched and the evidence to be seized; (2) the warrants were overly broad; and (3) the warrants were

based on stale evidence. The government rejects each attack upon the warrants and supporting affidavit and, in any event, argues that the searches should be upheld under the good faith exception to the exclusionary rule.[1] (Doc. No. 133.)

In Case No. 5:14CR163, defendant Turner seeks to suppress evidence seized from 1934 13th Street, Akron, Ohio, on January 13, 2014. (Doc. No. 7.) The government opposes this motion, as well.[2] (Doc. No. 13.) Like DeJournett, Turner argues that the affidavit supporting the warrant failed to establish the necessary nexus, lacked the requisite particularity, and was based on stale evidence. Turner also requests a *Franks* hearing. The government opposes these attacks and also challenges Turner's standing to challenge the search of the Akron residence, noting that Turner has never asserted "that the location searched was his or that he had a legitimate privacy interest in the premises." (Case No. 5:14CR163, Doc. No. 13 at 57.)

On October 24, 2013, a warrant application was submitted for the search of various locations, including the aforementioned two storefronts and DeJournett's Bath, Ohio residence. On January 13, 2014, an application was presented to the neutral

---

[1] DeJournett's motion includes a request for an evidentiary hearing. The government opposed the request, noting that the motion can be resolved without considering matters outside of the four-corners of the warrants and the supporting affidavit. At the motion hearing on June 27, 2014, counsel for DeJournett conceded that his client's attacks upon the searches were legal in nature and confined to the four corners of the search warrants and supporting affidavit. *See United States v. Knowledge*, 418 F. App'x 405, 408 (6th Cir. 2011) ("A defendant is not entitled to an evidentiary hearing where his arguments are 'entirely legal in nature.'") (quoting *Abboud*, 438 F.3d at 577); *United States v. Abboud*, 438 F.3d 554, 594 (6th Cir. 2006) (emphasis in original) ("An evidentiary hearing is required 'only if the motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that *contested issues of fact* going to the validity of the search are in question.'") (quoting *United States v. Downs*, No. 96-3862, 1999 WL 130786, at *3 (6th Cir. Jan. 19, 1999)) (emphasis in original). Finding that the challenges to the searches are entirely related to the legal sufficiency of the warrants and the supporting affidavit, and do not require the resolution of any factual disputes, the Court agrees that an evidentiary is not need or required.

[2] To aid in its consideration of Turner's motion to suppress, the Court instructed the parties to file supplemental briefing on the issues of standing and good faith. Turner filed a supplemental brief on July 8, 2014 (Doc. No. 16), and the government filed a supplemental brief on July 29, 2014. (Doc. No. 19.)

magistrate seeking permission to search 1934 13th Street in Akron Ohio, which was believed to be Turner's residence. The search of the Akron residence yielded, among other things, a distributable amount of marijuana and a pistol. Based on these results, Turner was charged in Case No. 5:14CR163.

All of the searches in these consolidated cases were supported by the same October 24, 2013 Master Affidavit, prepared by FBI Task Force Officer Michael Gilbride and totaling 82 pages. (Master Affidavit, Doc. No. 126-1.) This supporting affidavit contained information derived from wiretaps, video surveillance, field investigation, and confidential informants, and included contributions from various federal and state law enforcement agencies. TFO Gilbride also drew from his considerable experience investigating "federal and state crimes involving drug trafficking, money laundering, and organized crime" in presenting the information to the neutral magistrate. (Doc. No. 126-1 ¶ 3.)

The affiant explained that, generally, his experience and training in investigating drug trafficking activity had taught him that the search of the residences of known drug dealers will "almost always produce evidence indicative of their illicit enterprise, even years after specific drug transactions have occurred." (*Id*. ¶ 10.) Based on this same experience, he also shared his belief that drug dealers often employ "limited, guarded, and coded" language when discussing drug activities amongst themselves. (*Id*. ¶ 12.)

As to the specifics of the investigation, the Master Affidavit provided that, beginning in October 2012, agents from various federal and state law enforcement agencies had been engaged in an investigation into drug trafficking activity in Akron,

Ohio. One of the focal points of the investigation was a Drug Trafficking Organization ("DTO") headed by defendant DeJournett. (*Id*. ¶ 4.) The Master Affidavit concluded that, based upon the information gleaned from the investigation—a portion of which was set forth in the affidavit—the affiant had reason to believe that defendants Denay Webb, Donyale Robinson, Dwayne Anderson Sr., Kevin Preston, Johnny Brown, Scott DeJournett (referred to herein as "S. DeJournett"), Willie Lewis, Sergio Noel, Christopher Mckinnie, and Turner were members of DeJournett's DTO. (*Id*. ¶ 5.) TFO Gilbride represented that the investigation revealed that DeJournett received multi-kilogram shipments of cocaine on a regular basis, which were then distributed to his Akron-based associates, which included Turner and several of the other defendants. (*Id*. ¶¶ 4, 5.)

The affidavit further provided that all of the defendants had prior felony convictions involving drugs and weapons. (*Id*. ¶ 7.) Among DeJournett's past convictions were multiple convictions in 2001 for possession of cocaine and a 2003 conviction for conspiracy and possession with intent to sell cocaine. (*Id*. ¶ 7(A).) Defendant Turner had a 2006 conviction for cocaine trafficking. (*Id*. ¶ 7(K).)

According to the affiant, a confidential informant ("CS-1") provided information to officers that, dating back to 2012, he had purchased cocaine from defendant DeJournett at two locations: 55 Shiawassee in Fairlawn, Ohio; and 2740 Foxwood Drive, Akron, Ohio. (*Id*. ¶ 128.) CS-1 further told officers that he had purchased cocaine from DeJournett as recently as one week prior to October 24, 2013. (*Id*.) The affiant also recounted a surveilled visit by CS-1 to the Fairlawn address, on October 24, 2013, whereby CS-1 met with DeJournett for the purpose of supplying

DeJournett $19,850.00 (in marked bills) in payment for a drug trafficking debt. (*Id.* ¶ 129.)

The affiant represented that the investigation revealed that DeJournett received a shipment of cocaine on August 11, 2013 and brought the drugs to 55 Shiawassee. (*Id.* ¶ 130.) The Master Affidavit recounted a series of intercepted cell phone conversations the following morning involving DeJournett and several of the co-defendants, including Turner, making plans to rendezvous at 55 Shiawassee. (*Id.* ¶¶ 33, 35-38, 41, 45.) In each call, the participants used guarded and vague language, suggesting that they would meet at or near the "office" for some undisclosed reason. Video surveillance of 55 Shiawassee that same morning captured footage of DeJournett and several other defendants, including Turner, arriving at 55 Shiawassee. With the exception of DeJournett, each defendant stayed at the Fairlawn residence only a few minutes, and several defendants were seen carrying a bag away from the establishment. (*Id.* ¶¶ 34, 39, 40, 42, 43, 43, 44, 46, 48.) The supporting affidavit does not state that Turner was observed carrying anything in or out of the building.[3] (*Id.* ¶ 40.)

Later that same afternoon, the affiant states that DeJournett and Robinson were observed in the parking lot of 55 Shiawassee. (*Id.* ¶ 56.) Immediately prior to the meeting, a cell phone call was intercepted between DeJournett and Robinson, wherein Robinson stated that he "need[ed] to run into" DeJournett. (*Id.* ¶ 55.) During the meeting, DeJournett had, in his possession, a box "with distinct tape markings on it." (*Id.* ¶ 56; *see*

---

[3] The affidavit further recounts that other defendants—in addition to Robinson—had phone conversations and ultimately met with DeJournett at 55 Shiawassee in the afternoon of August 12, 2014. (*Id.* ¶¶ 53-72.) These phone calls and visits were similar to the ones that took place earlier in the day, involving vague conversations followed by brief visits to 55 Shiawassee, with several defendants leaving the building with packages.

*also* ¶¶ 48-52.) Two days later (on August 14, 2014), Robinson was arrested and was found to be in possession of the same box. The box contained 3.71 kilograms of cocaine. (*Id*. ¶¶ 56 (n.2), 80.)

The affiant stated that he believed "from training, experience, and involvement in the within investigation, and the context of the conversations listed [in the affidavit] that DEJOURNETT provided quantities of cocaine to [various defendants, including Turner] throughout the course of the day and evening of August 12, 2013 while at 55 Shiawassee Avenue Suite 8 AKA: Fl. (*Id*. ¶ 130.) He further surmised that, as a result, he had reason to believe that drugs and evidence of drug trafficking would be found at 55 Shiawassee (*Id*. ¶ 135), as well DeJournett's residence in Bath, Ohio. (*Id*. ¶ 138.)

The affidavit set forth similar evidence the affiant believed established that DeJournett had received subsequent shipments of cocaine on other dates—including shipments on August 1, 2013 and October 20, 2013—and distributed the cocaine to his regular customers, which included several defendants. (*Id*. ¶¶ 73- 80, 124-36.) DeJournett followed the same procedure employed with the August 11, 2013 shipment, involving guarded cell phone calls with, and brief visits to 55 Shiawassee by, several of the defendants. The affidavit does not state that defendant Turner was among the individuals DeJournett met with in connection with these two drug shipments.

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Pardo*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting

*United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical conception that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier,* 423 F.3d at 531)*; see United States v. Lazar*, 604 F.3d 230, 241-42 (6th Cir. 2010) (trial judge properly found probable cause in common-sense manner where affidavit was based on two-year involvement in the case, personal visits to locations, review of bills, and extensive interviews).

        *1.*    *The Searches of 55 Shiawassee and 2740 Foxwood Drive*

        DeJournett first challenges the sufficiency of the affidavit supporting the warrants because it allegedly failed to establish the necessary nexus between the places searched and the items to be seized. "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)); *see Frazier*, 423 F.3d at 531 (internal quotation marks and citation omitted).

        The warrant sought permission to search several locations. Two of the locations were storefronts (both at 55 Shiawassee Avenue, Fairlawn, Ohio) that DeJournett was believed to be using as locations to store and/or distribute cocaine to

various local dealers. (Doc. No. 126-1 at ¶¶ 21, 131.) A third location (2740 Foxwood Drive, Bath, Ohio) was DeJournett's primary residence in Akron, which DeJournett was also believed to be using both to sell and store the drugs and the proceeds from the trafficking. DeJournett's suppression motion is confined to the legality of the searches at these three locations.

As set forth above, the Master Affidavit provides that law enforcement first received an anonymous tip that DeJournett, an alleged known drug dealer, and others were involved in drug activity in a variety of places including 55 Shiawassee Avenue in Fairlawn, Ohio. (*Id.* ¶ 21.) The supporting affidavit also detailed the results of surveillance at 55 Shiawassee Avenue that were consistent with drug trafficking activity. The affidavit recounted the foot traffic of DeJournett and other known drug associates coming and going from the property, often times carrying concealed packages in and/or out of the building. (*see, e.g, id.* ¶¶ 30, 32, 34, 39-40, 42, 44, 46-47, 51, 54, 56-57, 60-61, 63-64, 66-68, 70-72.) The affidavit also reproduced intercepted conversations that involved drug sales occurring at 55 Shiawassee Avenue, many conversations coinciding with suspected drug activity in the building. (*see, e.g., id.* ¶¶ 31, 33, 35-38, 41, 45-46, 48, 55, 58-59, 62, 130.) Additionally, the affidavit provided that a confidential informant ("CS-1") indicated that he had purchased drugs from DeJournett at the Fairlawn address and at DeJournett's home in Bath, Ohio (Foxwood address). (*Id.* ¶ 128.) Additionally, CS-1 participated in a controlled payout at Foxwood Drive, wherein CS-1 paid DeJournett $19,850 to satisfy CS-1's purported drug debt to DeJournett. Based on these documented activities and conversations, TFO Gilbride concluded that DeJournett and his associates were using the easternmost suit in the building to keep contraband, and

Suite 8 to conduct transactions. (*Id.* ¶¶ 129, 131.)[4]

The supporting affidavit amply established that drug purchases and other drug activity had taken place at two locations within the Fairlawn address, establishing the requisite nexus for the search at these locations. *See United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009) (evidence that drug transaction had taken place in basement of place to be searched satisfied "nexus" requirement); *United States v. Pusey*, 189 F. App'x 475, 479-80 (6th Cir. 2006) (evidence of "people frequently coming and going to and from the residence in a manner commonly associated with drug activity" contributed to probable cause for search). As such, the Master Affidavit allowed a neutral magistrate to conclude that there was a "fair probability" that information involving illegal drug activity would be found at the Fairlawn address.

This same evidence supports a finding of a "fair probability" that evidence of criminal activity would be found in DeJournett's residence.[5] Again, TFO Gilbride stated that it is his experience that evidence of drug activity can often be found at the drug dealer's residence. This, alone, is sufficient to establish a nexus to search the residence. *United States v. Goward*, 188 F. App'x 355, 358-59 (6th Cir. 2006) (evidence of drug deals away from the residence, coupled with affiant's experience that drug dealers keep evidence of dealing at their residence, was sufficient to establish nexus to search residence—even without evidence of drug activity at the residence); *see United States v. Washington*, 380 F.3d 236, 246 (6th Cir. 2004) (evidence of drug dealing

---

[4] As for proof that drugs were stored at 55 Shiawassee, the affiant summarized a conversation between co-defendant Webb and Willie Sanders Jr. that revealed that Sanders was planning to steal a quantity of cocaine Webb had previously observed with DeJournett at 55 Shiawassee Avenue. (*Id.* ¶¶ 22-23.)

[5] Defendant DeJournett does not contest that the Bath, Ohio location is his residence.

sufficient to justify search of drug dealer's home and collecting cases); *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000) (same). The search of the residence was further supported by a controlled payout on a purported drug debt at the location. (Doc. No. 126-1 ¶ 131.)

Based on the "totality of the circumstances," the Court finds that the Master Affidavit supplied the necessary nexus between the Fairlawn and Bath, Ohio locations and the evidence sought. *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006).

Defendant DeJournett also insists that the "Affidavit and Applications seek an overbroad warrant that includes virtually anything and everything that could be found inside of a legitimate and/or illicit business[.]" (Doc. No. 123 at 564), thereby violating the "particularity" requirement. The warrant applications sought certain categories of items, such as "books, records, receipts," "electronic address and/or telephone directories," currency, pagers and cell phones, photographs of controlled substances, and records of income and expenditures. (Doc. No. 126-2 at 718.)

The Fourth Amendment requires a warrant to "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. "The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging rummaging searches in violation of the Constitution's proscription against unreasonable searches and seizures." *United States v. Logan*, 250 F.3d 350, 365 (6th Cir. 2001) (citing *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S. Ct. 2737, 49 L.Ed.2d 627 (1976)). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought[,]" *United States v.*

*Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988), and a determination as to particularity is "best resolved upon examination of the circumstances of the particular case." *Logan*, 250 F.3d at 365 (citation omitted). Further, "[a] description contained in a warrant is sufficiently particular if it is as specific as the circumstances and the nature of the alleged crime permit. In addition, once a category of documents has been adequately described in the warrant, in part by an illustrative list of items to be seized, the Fourth Amendment is not violated when officers executing the warrant exercise minimal judgment as to whether a particular document falls within the described category." *Id.* (internal citations omitted).

The government admits that the 13 classes of items sought "were indeed generic." (Doc. No. 133 at 1269.) Nonetheless, the government argues that these categories of items sought were rationally related and reasonably likely to demonstrate the existence of a drug trafficking organization. The Court agrees. *See Abboud*, 438 F.3d at 575 (warrant was sufficiently particular where it sought specific items—logs, ledgers, bank statements—likely to be associated with fraudulent scheme); *see, e.g., United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000) (warrant authorizing seizure of records of financial transactions and electronic equipment designed to aid in drug trafficking sufficient to satisfy particularity requirement).[6] Each of the items identified were likely to be associated with drug trafficking.

---

[6] The government also maintains that some of the items discovered, such as the handgun and ammunition, while they did not fall within one of the 13 stated categories, were properly seized because they were found in plain view. *See United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011) (the plain view doctrine can provide an independent basis for denial of a suppression motion where the officers were lawfully in a position from which to view the object, its incriminating character is immediately apparent, and the officers had a lawful right of access to the object). DeJournett did not challenge this independent basis for the government's seizure of these items.

Of course, even if the Court found that portions of the warrants were overly broad, the remedy would not necessarily be suppression of all evidence derived from the searches. Instead, the proper remedy would be to "sever the overbroad portions of the warrant from those portions that are sufficiently particular." *United States v. Ford*, 184 F.3d 566, 578 (6th Cir. 1999) (citing *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir.), *cert. denied*, 502 U.S. 1008, 112 S. Ct. 646, 116 L.Ed.2d 663 (1991); *see United States v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011)*; see, e.g., Abboud*, 438 F.3d at 576 (proper to suppress only documents beyond the relevant time period); *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001) (severance of overbroad clause in warrant did not "impugn the validity of the seizure of the three firearms which are the basis for Green's conviction" and were properly seized pursuant to the warrant); *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991) ("jewelry seized pursuant to the overbroad portion of the search warrant was not introduced into evidence"). DeJournett has failed to identify what items seized were a result of any over breadth in the warrants. As such, even if this Court were to find over breadth, DeJournett has failed in his burden of identifying what evidence would be properly suppressed. The Court rejects defendant DeJournett's particularity challenge

In his final attack upon the search warrant, DeJournett posits that it was based on stale evidence. The probable cause requirement for a search warrant "is concerned with facts relating to a presently existing condition." *Abboud*, 438 F.3d at 572 (citation and quotation marks omitted). "Thus, the critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the

search]." *Id.* (citation and quotation marks omitted). In considering the issue of staleness, the Sixth Circuit has outlined several factors to consider: (1) the character of the crime; (2) the criminal under investigation (nomadic or entrenched); (3) the thing to be seized; and (4) the place to be searched *Id.*; *see United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010). Evidence of ongoing criminal activity will generally defeat a claim of staleness. *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

In support of his staleness argument, DeJournett observes that the affidavit and warrants "appear to rely heavily" upon the information provided by the "confidential concerned citizen" in December 2012. (Doc. No. 123 at 558.) However, while the affidavit leads with the 2012 tip, the affidavit goes on to set forth facts establishing that defendant possessed five kilograms of cocaine at the Shiawassee storefront on June 2013, distributed cocaine in August 2013, and received a shipment of cocaine on October 20, 2013—four days before the warrant issued. Additionally, CS-1 indicated that he and DeJournett participated in ongoing drug sales, with a recent sale of one-half kilogram, and that the controlled payout took place immediately prior to the warrant issuing—the same day—on October 24, 2103. (Doc. No. 126-1 ¶ 129.) This ongoing criminal conduct cures any possible staleness. The Court, therefore, rejects defendant DeJournett's staleness attack upon the supporting affidavit.

On the whole, the Master Affidavit provided a sufficient basis for the neutral magistrate to conclude that there was probable cause to believe that evidence of drug trafficking was likely to be found at the Fairlawn and Bath addresses. For this reason alone, DeJournett's motion to suppress must be denied.

Even if probable cause were lacking, however, the searches in question

would still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon*, 468 U.S. at 905). The "good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922-23 n.23.

The good-faith defense will not apply, however, where: 1) the supporting affidavit contains information the affiant knew or should have known is false; 2) the issuing magistrate lacked neutrality and detachment; 3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable; or 4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted).

None of the exceptions to the good faith rule in *Leon* apply, inasmuch as DeJournett has not alleged that the supporting affidavit contains false information or that the affiant acted in bad faith, there is no evidence that the issuing magistrate—District Court Judge John Adams—was not neutral, the affidavit was not "bare bones," and the affidavit is not facially deficient.

Moreover, given the obvious effort exhibited by the applying agent to

15

comply with the requirements of Fourth Amendment (including the level of detail and the level of care given to tie DeJournett and his co-defendants to the property to be searched and the drug activity under investigation), coupled with the fact that the applications were granted by a detached and neutral magistrate, the Court cannot find that a reasonably well trained officer would have known that the searches in question were illegal, if, in fact, they were illegal. *See, e.g., United States v. Stelton*, 867 F.2d 446, 451 (8th Cir. 1989) (good faith exception applied where agents "took much care in drafting the descriptions of the items to be seized"); *United Sates v. Buck*, 813 F.2d 588, 592-93 (2d Cir. 1987) (good faith exception applied where officers provided details outlining the crimes and the evidence sought to a neutral magistrate). The Court thus finds that the searches were constitutionally valid for the additional reason that the officers executed the search warrants at the three locations in question in good faith.

Because the warrants and the supporting affidavit satisfy the Fourth Amendment's requirements, and the warrants were executed in good faith, DeJournett's motion to suppress the evidence resulting from the searches in Fairlawn and Bath, Ohio is denied.

## 2. *The Search of 1934 13th Street*

### *Standing*

In its initial response, the government challenged Turner's standing to attack the search of 1934 13th Street. It is a well-established principle that as a threshold matter to invoking the exclusionary rule, a criminal defendant "bears the burden of showing that his *own* Fourth Amendment rights were violated." *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (citation omitted) (emphasis added); *see United States*

*v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). To establish standing to challenge a government search, "a defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate." *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988)).

"The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests . . . ." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (citation omitted). The Sixth Circuit has, in certain circumstances, "even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence." *Id.* (citing *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005). Moreover, the fact that the invited individual may use the space searched for criminal activities "does not alter the privacy expectations of a person who would otherwise have standing." *Id.* (citing *Minnesota v. Carter*, 525 U.S. 83, 91, 119 S. Ct. 469, 142 L.Ed. 2d 373 (1998)) (further citation omitted).

In support of standing, Turner has submitted an affidavit from Eugena Fletcher. (Doc. No. 16, Ex. A.) Ms. Fletcher avers that Turner is her husband, but that she and Turner separated in December of 2013. (*Id.* ¶¶ 2, 4.) She further avers that she is the owner of the property located at 1934 13th Street, Akron, Ohio, and that, notwithstanding her separation from Turner, she occasionally permits Turner to spend the night at the property as her guest. (*Id.* ¶¶ 3, 6.) Turner continues to keep "clothes, hygiene productions, and some other personal property at [Fletcher's] residence." (*Id.* ¶ 7.) According to Fletcher's affidavit, Turner spent the night as her guest on June 12, 2014,

and was still present on the morning of January 13, 2014 when officers arrested Turner and executed a search of the residence. (*Id.* ¶¶ 8, 9.)

Given the fact that Turner has established, solely for purposes of the present motion to suppress, that he was an invited overnight guest of the owner of the premises searched, and that he was permitted by the owner to keep clothing and other personal effects at the premises, the Court finds that he has sufficiently demonstrated a subjective expectation of privacy in the property that society is prepared to recognize. *See Washington*, 573 F.3d at 283; *Waller*, 426 F.3d at 844.[7] As such, the Court concludes that Turner has standing to challenge the search of the Akron residence that is the subject of his suppression motion.

*Turner's Arguments*

Turner raises several of the same challenges to the January 13, 2014 search warrant for 1934 13th Street that DeJournett raised in connection with the earlier searches of the Fairlawn and Bath addresses. Turner's particularity argument fails for the same reasons the Court rejected DeJournett's particularity challenge. Moreover, as was the case with DeJournett, Turner's remedy for any over breadth would be limited to suppression of any items seized as a result of an overreaching warrant. *See Hanna*, 661 F.3d at 286; *Ford*, 184 F.3d at 578; *see, e.g., Abboud*, 438 F.3d at 576; *Greene*, 250 F.3d at 477. Yet, like DeJournett, Turner has failed to identify any items that were seized as the result of any overreaching in the warrant application. Turner's remaining

---

[7] The government concedes as much in its supplemental brief. (Doc. No. 19 at 89-90.)

arguments—relating to the nexus between the items sought and the location to be searched and the staleness of the supporting evidence—demand independent analysis.

Turner argues that the supporting affidavit failed to establish a reason to believe that the items sought in the January 13, 2014 search would be found at 1934 13th Avenue. He highlights the fact that there were no citizen complaints or informant tips that drug sales were taking place at this location, nor was there evidence that visual surveillance, trash pulls, wiretaps, or other investigative techniques uncovered any drug activity there. The government dismisses this argument, noting that the search of 1934 13th Avenue was premised on the previously discussed well-established line of cases holding that evidence of drug trafficking will be found at the residence of those who traffic drugs. *Accord United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir.) (holding that although defendant, a known drug dealer, was arrested with drugs at another location there was sufficient nexus to establish probable cause for a search warrant of his residence) (collecting cases), *cert. denied*, 537 U.S. 1130 (2002); *United States v. Gunter*, 551 F.3d 472, 481-82 (6th Cir. 2009) (reasonable to infer that evidence of drug trafficking would be found at residence of drug dealer).

While not directly challenging case law that would support the search of a known drug trafficker's home, Turner insists that this authority cannot support the search of his wife's residence because the affidavit failed to establish that *he was a drug trafficker*. *See Frazier*, 423 F.3d at 533 ("Where, as here, the warrant affidavit is based almost exclusively on the uncorroborated testimony of an unproven confidential informants (none of whom witnessed illegal activity on the premises of the proposed search), the allegation that the defendant is a drug dealer, without more, is insufficient to

tie the alleged criminal activity to the defendant's residence.") (citing *United States v. Savoca*, 761 F.2d 292, 295 (6th Cir. 1985)); *see, e.g., United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006) (McPhearson was not a known drug dealer: his prior convictions were for property crimes, and the warrant on which the police arrested him was for simple assault. In the absence of any facts connecting McPhearson to drug trafficking, the affidavit in this case cannot support the inference that evidence of wrongdoing would be found in [his] home . . . ."). Focusing on what is *not* in the affidavit, Turner emphasizes that there is nothing in the affidavit to suggest that he visited 55 Shiawassee around the time of the August 1, 2013 or October 20, 2013 drug shipments. Also, considering separately and in isolation his own actions on August 12, 2013, he underscores the fact that the affidavit fails to state that he carried anything in or out of 55 Shiawassee. At the motion hearing, his counsel further emphasized that, prior to his visit on August 12, 2013, he participated in an innocuous cell phone conversation with DeJournett with no mention of a drug sale.

Turner's criticism of what the Master Affidavit does not contain is of no moment because an affidavit supporting a search warrant application is "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc). Moreover, the Court is not to engage in a "line-by-line scrutiny" of the supporting affidavit, but, rather, must determine whether under the totality of the circumstances, the magistrate had a substantial basis for concluding that a search would uncover wrongdoing. *See United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004).

Considering the affidavit, in its totality, the Court finds a sufficient nexus between the crime of drug trafficking and 1934 13th Street, such that the connection is not "so vague as to be conclusory or meaningless." *Frazier*, 423 F.3d at 588 (citations and quotation marks omitted). In addition to evidence of Turner's prior conviction for drug trafficking, the affidavit set forth evidence from which a reasonable officer could infer that Turner had engaged in drug trafficking. The affidavit established that, the day after a known drug dealer took a shipment of cocaine from his supplier, Turner—along with others believed to be mid-level drug distributors—visited DeJournett at a property where prior drug sales had taken place. The visits were preceded by vague phone conversations with DeJournett, wherein the parties agreed to meet.[8] The sequence of events the morning of August 12, 2013 illustrates the connection.

- 9:33 am DeJournett calls Turner (¶ 33)
- 9:42 am DeJournett arrives at 55 Shiawassee (¶ 34)
- 9:43 am defendant Anderson calls DeJournett (¶ 35)
- 9:49 am DeJournett calls Scott DeJournett (¶ 36)
- 9:50 am defendant Brown calls DeJournett (¶ 37)
- 9:53 am DeJournett calls Turner (¶ 38)
- 9:53 am Turner arrives at and enters 55 Shiawassee (¶ 39)
- 9:54 am Turner leaves 55 Shiawassee (¶ 40)
- 9:54 am DeJournett calls defendant Noel and tells him to hurry up (¶ 41)
- 10:12 am Anderson arrives at and enters 55 Shiawassee (¶ 42)
- 10:23 am Noel arrives at and enters 55 Shiawassee (¶ 43)
- 10:24 am Anderson leaves 55 Shiawassee (¶ 44)
- 10:27 am Noel calls DeJournett who tells him he's in the back (¶ 45)
- 10:36 am Brown arrives at and enters 55 Shiawassee (¶ 46)
- 10:42 am Brown leaves 55 Shiawassee carrying a bag (¶ 47)

---

[8] In his initial call to Turner, DeJournett instructed Turner to "slide to Target real fast." (Doc. No. 126-1 ¶ 33.) According to the government, this was a reference to the "office" (55 Shiawassee), as there was a Target retail store nearby. (Doc. No. 19 at 93.) Similar coded language was used during intercepted calls between DeJournett and other defendants For example, in a call 10 minutes later, DeJournett advised defendant Anderson that he was "at Office Max," which was another reference to the "office" at 55 Shiawassee. When defendant Anderson jokingly extended the business analogy by suggesting that he wanted to "get some new staplers and stuff," DeJournett admonished him for talking too much. (*Id*. ¶ 93.)

The affiant averred that this flurry of activity on the morning after a known and established drug dealer received a shipment of cocaine was consistent with drug trafficking. While there could be an innocent reason why Turner received a call from a known drug trafficker and went to 55 Shiawassee at precisely the same time that other known drug dealers were allegedly receiving installments of drugs, the evidence is more than sufficient for an officer trained in drug trafficking to have a substantial basis from which to conclude that Turner was participating in drug trafficking. *See United Sates v. Wagers*, 452 F.3d 534, 542 (6th Cir. 2006); *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) ("the probable cause requirement does not require that every hypothesis be excluded") (citation and quotation marks omitted). This connection to drug trafficking, in turn, supplies the necessary nexus to support the search of a residence believed to be Turner's home

Turner's staleness argument is more problematic. The August 12, 2013 alleged drug distribution is the last mention of any drug-related activity by Turner. Yet, the warrant to search the premises in question was not issued until January 2014. While ongoing criminal activity can cure an otherwise stale warrant, *see Greene*, 250 F.3d at 481, the link to 1934 13th was *Turner's* alleged drug trafficking. Therefore, drug activity by other participants cannot serve to refresh an otherwise stale warrant, and the Court must determine whether the five month gap defeats probable cause.[9] *See, e.g., United*

---

[9] In its supplemental response, the government explained that the original indictment, filed November 20, 2013, charged DeJournett as the sole defendant. The search of Turner's suspected residence was coordinated to take place in connection with the unsealing of the superseding indictment, which added Turner and eight others as defendants in the case. (Doc. No. 19 at 88.)

*States v. Paymon*, 523 F. Supp. 2d 584, 590-91 (E.D. Mich. 2007) (finding that the only evidence placing *defendant* in contact with drug trafficking conspiracy was stale).

Turing to the aforementioned factors that guide the staleness inquiry, courts have recognized that, because "drugs are usually sold and consumed in a prompt fashion," information regarding the presence of drugs at a particular location "goes stale very quickly[.]" *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (citation and quotation marks omitted). Nonetheless, a search may be based on older information in situations where officers are searching for other indicia of drug trafficking that are more "enduring" than drugs. Moreover, when the evidence sought concerns a long-term criminal operation, greater lapses of time between the information relied upon and the request for a search warrant is permitted. *United States v. Thomas*, 605 F.3d 300, 309-10 (6th Cir. 2010) (eight month old tip from confidential informant as to marijuana growing operation on premises not stale). The Sixth Circuit has found the distribution of illegal drugs to be a long-term criminal operation. *See, e.g., United States v. Spikes*, 158 F.3d 913, 923-24 (6th Cir. 1998). Additionally, courts have noted that the indicia of criminal activity may remain for some period of time after the defendant's last reported criminal activity. *United States v. Canan*. 48 F.3d 954, 959 (6th Cir. 1995).

While the staleness inquiry involves a fact-specific, case-by-case analysis, *see Spikes*, 158 F.3d 923, the Court can take some guidance from other cases. In *United States v. Word*, 806 F.2d 658, 662 (6th Cir. 1986), the court found that probable cause for a search warrant existed despite the passage of four months since the last documented drug sale. There, law enforcement had been investigating an illegal prescription drug distribution. The search of defendant's pharmacy was upheld, despite the four month

delay in seeking a warrant, where the affidavit demonstrated that the drug activity was of a continuing nature and the business records sought were kept in the ordinary course of business. *Id.* Similarly, in *United States v. Simons*, No. 3:11-cr-00012-4, 2012 WL 2921841, at *9 (M.D. Tenn. July 17, 2012), the court found that a three month delay did not render evidence stale where warrant sought enduring items—such as records, ledgers, and drug proceeds—and another defendant had a continuing connection with place to be searched. *Cf. United States v. Ervin*, No. 3:09-00130, 2010 WL 200799 (M.D. Tenn. Jan. 14, 2010) (lack of probable cause where informant's tip that he had purchased drugs on the premise to be searched was six months old).

   The search at issue in Turner's motion presents a more challenging issue. The warrant seeks books and other records that are of a more enduring nature than readily consumable drugs, and the search involved an investigation into a long-term criminal operation. Moreover, the Master Affidavit provided that the affiant's training and experience taught him that such indicia of drug trafficking could be expected to be found long after the conclusion of such criminal activity.[10] Nonetheless, the only evidence tying the premises searched to any illegal activity—Turner's involvement in the August 12, 2013 drug distribution—took place more than five months before the warrant was sought. There was no information in the affidavit that Turner ever used this residence as a base of operation for his alleged drug trafficking activities, or that any of his alleged co-conspirators had any ongoing connection to the premises. *Compare Spikes*, 158 F.3d at

---

[10]Specifically, the Master Affidavit provided that a search of a drug traffickers' residence is likely to 'produce evidence indicative of their illicit enterprise, even years after specific drug transactions have occurred." (Doc. No. 126-1 ¶ 10.)

924 (warrant not stale where premises served as base of operation for ongoing drug trafficking enterprise); *with United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (warrant stale where no date was given for controlled buy and there was no evidence that the premises was used as a secure operational base for an ongoing drug enterprise) (citation omitted); *see also United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (The passage of time becomes less significant when the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime.) (citations omitted). Although these competing principles make a determination of staleness less than straight forward, the Court need not reach the issue of staleness because, even if the evidence was stale as to Turner, the officers executing the search of 1934 13th Street could have reasonably, and in good faith, relied on the warrant's validity.

> *Good Faith*

In response to the government's alternative *Leon* "good faith" argument, Turner insists that the Master Affidavit is nothing more than "bare bones" "as it applies solely to Mr. Turner's alleged involvement[,]" and that it is so lacking in indicial of probable cause that no reasonable officer could rely on it. (Doc. No. 16 at 76.)

"'An affidavit that states suspicions, beliefs, or conclusions without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit,' which is not sufficient to support a finding of probable cause." *United States v. Buffer*, 529 F. App'x 482, 484 (6th Cir. 2013) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)) (further citation omitted); *see United States v. Pope*, 467 F.3d 912, 920 (6th Cir. 2006) ("Generally, examples of

'bare bones' affidavits include those that merely state that the affiant has cause to suspect and does believe or [has] received reliable information from a credible person and [does] believe that contraband is located on the premises.") (citations omitted); *see also United States v. Van Shutters*, 163 F.3d 331, 338 (6th Cir. 1998) (distinguishing case where officer had little more than a "hunch," based on his training and experience, that evidence would be found at the premises to be searched).

Here, it cannot be said that TFO Gilbride's detailed affidavit is supported by little more than a hunch and a conclusion that evidence would be found at 1934 13th Street. The affiant laid out the details of an extensive and thorough investigation, and documented—through informant's tips and payouts, surveillance, and intercepted phone calls—Turner's participation in DeJournett's alleged DTO. Courts have certainly upheld less substantial affidavits under *Leon. See United States v Savoca*, 761 F.2d 292, 298 (6th Cir. 1985) (upholding "terse" affidavit that merely stated that two individuals known to be involved in bank robberies had been seen in a motel room together two thousand miles from the robberies); *but see United States v. Weaver*, 99 F.3d 1372, 1377-78 (6th Cir. 1996) (affidavit merely "bare bones" where it was based on an anonymous tip, lacked particularized incriminating facts, and used conclusory statements, as well as boiler plate language).

Nor can this Court find that the affidavit was so lacking in indicia of probable cause that it was unworthy of reliance. To fit this exception, the officer must have "no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 923. "The fact that an affidavit fails to establish probable cause is not determinative of whether that affidavit could support a reasonable belief in the validity of

the search warrant for purposes of the exclusionary rule." *United States v. Rice*, 405 F. App'x 959, 963 (6th Cir. 2010) (citing *McPhearson*, 469 F.3d at 526). As the court in *Rice* explained, the reason is that the standard for applying the good faith exception of *Leon* is lower than that which is required for probable cause.

> A police officer's objectively reasonable reliance on a signed search warrant requires 'a less demanding showing' than the 'substantial basis' threshold required for probable cause. If the inquiries were identical, the probable cause determination would subsume the good faith exception.

*Id*. at 963 (internal citations and quotation marks omitted).

Applying this less demanding standard, the Court finds that, even if the warrant was stale as to Turner, officers could have had reasonable grounds for believing that the warrant was properly issued. The warrant was sought in connection with an extensive drug trafficking investigation. The supporting affidavit clearly established the existence of the DTO and Turner's participation in it, and further established that the drug activity of the DTO was ongoing, long after Turner's last cited activity. Moreover, the warrant sought books, ledgers, and other materials that were more enduring than drugs and more likely to remain long after the illegal activity ceased. Based on all of these facts, the Court concludes that the "good faith" rule applies to cure any possible deficiency in the warrant, and the Court will not suppress the evidence.[11]

### Franks Hearing

In connection with his suppression motion, Turner seeks what has become known as a "*Franks* hearing." In *Franks v. Delaware*, the Supreme Court held that a

---

[11] Likewise, even if the warrant had failed to set forth a sufficient nexus between the premises and drug trafficking to support probable cause, the affidavit still sufficiently established a "minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity[.]" *See United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004).

criminal defendant may attack the veracity of the statements relied upon by law enforcement to procure search warrants. Under *Franks*, to be entitled to an evidentiary hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . ." 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L.Ed.2d 667 (1978); *see United States v. Fields*, 229 F.3d 1154 (6th Cir. 2000) (table decision) ("To prevail, [the defendant] is required to make a *substantial* preliminary showing that an affiant deliberately or recklessly included false information in the affidavit.") (citation omitted, emphasis in original). "The defendant must specifically point to the disputed portions of the challenged affidavit, and must support these charges with an offer of proof."[12] *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (citing *Franks*, 438 U.S. at 171). "If the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id*. (citing *Franks*, 438 U.S. at 171).

However, a hearing is not required when a defendant merely wishes to cross examine government witnesses. *Franks*, 438 U.S. at 171. Additionally,

---

[12] In *Stewart*, the Sixth Circuit cautioned that:

> A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. He must accompany his allegations with an offer of proof. Moreover, he also should provide supporting affidavits or explain their absence. If he meets these requirements, then the question becomes whether, absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause.

*Id*.

"[a]llegations of negligence or innocent mistake are insufficient to show deliberate falsity [or] reckless disregard." *United States v. Kelley*, 596 F. Supp. 2d 1132, 1149-1150 (E.D. Tenn. 2009) (citing *Franks*, 438 U.S. at 171).

Turner does not suggest that the affidavit supporting the search warrant contains false statements. Instead, he suggests that "mischaracterizations, misrepresentations and/or omissions contained in TFO Gildbride's master affidavit warrant . . . an evidentiary hearing [.]" (Doc. No. 16 at 81.) The Sixth Circuit has "held that omissions 'are not immune from inquiry under *Franks*, [but it has] recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct that one which affirmatively includes false information.'" *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quoting *United States v. Atkins*, 107 F.3d 1213, 1217 (6th Cir. 1997)); *see Abboud*, 438 F.3d at 574 ("This Court has interpreted *Franks* to include omissions.") (citations omitted). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matters that might, if included, have redounded to defendant's benefits." *Atkins*, 107 F.3d at 1217 (internal citation and quotation marks omitted).

It is for this reason that that the Sixth Circuit has "'repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement.'" *United States v. Speer*, 419 F. App'x 562, 571 (6th Cir. 2011) (quoting *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008)). In fact, "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical

information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis in original).

In support of his request for a *Franks* hearing, Turner offers an alternative account of why he was observed by officers meeting with defendant DeJournett on August 12, 2013 at the storefront office located at 55 Shiawassee. He maintains that he owns a cleaning service, and that he had arranged to meet DeJournett that day "in order to receive payment for cleaning services previously rendered for Mr. DeJournett's various businesses." (Doc. No. 16 at 72-3.)

Given this innocent explanation for his presence at the Fairlawn address, Turner identifies the following alleged material omissions: (1) that he was "not involved in any way" with the alleged August 1, 2013 cocaine shipment; (2) that he was observed entering the Fairlawn address "empty handed;" (3) that he was inside the building for "less than one minute (to receive payment for cleaning [s]ervices previously rendered);" (4) that he was observed leaving the building "empty handed;" (5) that he was "never again" observed going in or out of the Fairlawn building; (6) that other "so called mid-level distributors" were observed carrying packages out of the Fairlawn building; (7) that Turner was "not involved in any way" with the alleged October 20, 2013 cocaine shipment; (8) that law enforcement received no complaints or tips of drug activity at his wife's residence; (9) that there was never any surveillance of his wife's residence; and (10) that no controlled buys were ever attempted from his wife's residence. (Doc. No. 16 at 77.)

None of these alleged omissions warrant a *Franks* hearing. The last three omissions—all relating to the premises located at 1934 13th Street in Akron, Ohio—are not material because the affiant did not seek to search this property on the basis of identified drug activity there. Rather, the search was premised on the affiant's experience that drug traffickers often keep evidence of drug transactions in their residences. (Doc. No. 126-1 ¶19.) *See United States v. Gunter*, 551 F.3d 472, 481-82 (6th Cir. 2009); *United States v. Kenny*, 505 F.3d 458, 461-62 (6th Cir. 2007); *McPhearson*, 469 F.3d at 524.

The fact that other individuals who were identified, along with Turner, as DeJournett's "mid-level distributors" were seen entering or exiting the Fairlawn storefront with packages *was* clearly set forth in the affidavit. (Doc. No. 126-1 ¶¶ 47, 51, 54, 56, 60, 61, 63, 64, 72.) Moreover, while the affidavit did not use the term "empty-handed" with respect to Turner's visit to the Fairlawn property, there was no suggestion by the affiant that Turner had anything in his possession upon entering or exiting the premises.[13] Likewise, the affidavit specifically and unequivocally provides that Turner was only in the building for one minute. (*Id.* ¶¶ 39-40.)

It is true that the Master Affidavit does not state that Turner could have been in the building for the purpose of recovering payment for legitimate cleaning services, nor does the affiant suggest that Turner could be innocent of the drug trafficking for which he stands accused. Nevertheless, the affiant was not required to vet every possible innocent theory in a supporting affidavit. *See Mays*, 134 F.3d at 816

---

[13] Similarly, while the affidavit did not state that Turner was never seen after August 12, 2013 at the Fairlawn premises, the affiant did not intimate or represent that Turner had made other trips to that location.

(distinguishing the government's duty under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), and finding that law enforcement officers need not "follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded"); *see, e.g., United States v. Perry*, No. 06-20172-BC, 2007 WL 1017570, at *13-*14 (E.D. Mich. Apr. 3, 2007) (failure to include facts suggesting an innocent reason—independent of drug activity—why defendant was meeting with his brother did not establish that the affiant exhibited a reckless disregard of the truth).

More to the point, Turner has wholly failed to meet his burden of showing that the affiant intentionally or recklessly omitted this information in order to secure the search warrant. *See Speer*, 419 F. App'x at 572 (district court did not err in refusing to hold a *Franks* hearing where the defendant failed to even attempt to demonstrate that the affiant intentionally, or with reckless disregard for the truth, failed to include certain facts in his affidavit); *see generally, United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003) (no *Franks* hearing warranted where no intentional or recklessly misrepresented facts appeared in the affidavit). Turner has not even suggested that the affiant was aware of, let alone intentionally withheld, the existence of Turner's cleaning company or this possible innocent explanation for his visit to 55 Shiawassee Avenue on August 12, 2013. While this explanation may be used by Turner at trial as a defense to the drug charges, it does not merit a *Franks* hearing.

### B. Motions to Suppress Title III Wiretaps (Doc. Nos. 122 and 142)

Defendant DeJournett seeks the suppression of all evidence obtained as a

result of the orders authorizing the interception of wire communications.[14] He claims that this result is required because there has been no showing that the government's wiretaps were necessary. He offers three reasons why the government cannot establish the "necessity" requirement to justify the wiretaps: (1) normal investigative procedures were successful; (2) officers failed to try or summarily rejected other traditional investigative methods likely to yield results; and (3) the government has attempted to manufacture "necessity" through setting vast investigative goals. In response, the government insists that the agent's affidavits and applications demonstrate that normal investigative methods, though some were initially successful, were not likely to continue to advance the investigation, and that the government was pursuing the reasonable goal of addressing narcotics trafficking organizations in Akron. (Response, Doc. No. 132.) The government also argues that DeJournett lacks standing to challenge the calls intercepted over TT-1, TT-2, or TT-3, but it does not take issue with his standing to challenge the calls intercepted on TT-13.[15]

The first application for interception of wire communications was filed by the government on March 14, 2013, and the first order of authorization was also filed on March 14, 2013. (Mar. 14, 2013 Application and Order of Authorization, Doc. No. 126-5, beginning at 731.) The first application, and every subsequent application, was accompanied by an affidavit sworn by DEA S.A. Kevin Borchet. (*See* Mar. 14, 2014

---

[14] On July 15, 2014, defendant Noel filed a motion challenging the wiretaps. (Doc. No. 142.) Because Noel's arguments reflect those previously raised by DeJournett, the analysis of DeJournett's arguments applies equally to Noel's motion.

[15] "TT" refers to "Target Telephone."

Affidavit, beginning at 749.) The first application sought the interception of calls over TT-1, TT-2, and TT-3. The second application in evidence, filed July 30, 2013, sought the interception of calls over TT-5, TT-12, and TT-13. (July 30, 2013 Order of Authorization, Doc. No. 126-6, beginning at 859.)

While each subsequent application and supporting affidavit added new factual details relevant to the particular cellular phone lines at issue, each of the applications and affidavits mirrored the originals, including the justification for continued interception of wire communications. Therefore, the legal analysis will apply equally to all applications and orders, and the Court will focus primarily upon the initial application and affidavit, as defendant DeJournett challenges the government's right to even utilize this investigatory technique.[16]

*1. Standing*

Title III allows an aggrieved person to move to suppress the contents of intercepted oral or wire communications, or evidence derived from such communications. An "aggrieved person," for purposes of 18 U.S.C. § 2518(10)(a), is a person "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]" § 2510(11). Therefore, only a person whose conversations or communications were intercepted, or who owned or possessed a phone from which conversations involving others was intercepted has standing to challenge the legality of the wiretap. *See United States v. Dickerson*, 651 F. Supp. 2d 739, 741 (N.D. Ohio 2009) ("The defendant only has standing as to conversations in which he

---

[16] Defendant DeJournett does not challenge the length of the wire taps, which, in any event, only last a few months.

participated, or which occurred over a telephone belonging to him: the fact that he was named in orders, but not intercepted does not give rise to standing.") (citation omitted).

An aggrieved person may challenge the use of such evidence at trial on the grounds that: (1) the communication was unlawfully intercepted; (2) the order of authorization or approval under which it was intercepted is insufficient on its face; or (3) the interception was not made in conformity with the order of authorization or approval. 18 U.S.C. § 2518(10)(a).

The government notes that DeJournett was not intercepted over TT-1, TT-2, or TT-3, and none of these cell phones belonged to him. On the other hand, the government concedes that TT-13 was possessed and used by DeJournett, resulting in his standing to challenge the calls on this line. Defendant DeJournett did not respond to the government's standing argument, nor otherwise demonstrate that he has standing to challenge the intercepted communications over TT-1, TT-2 or TT-3. The Court, therefore, finds that DeJournett only has standing to challenge the calls intercepted over TT-13.[17]

2. *Necessity*

Title III dictates that an application for a wiretap contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18

---

[17] Defendant Noel's motion is limited to TT-13 and, in particular, those intercepted calls over TT-13 to which he was a party. The Court finds, and the government concedes, that Noel has standing to challenge these calls.

U.S.C. § 2518(1)(c)). The purpose of this "necessity" requirement is "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir.), *cert. denied*, 488 U.S. 821 (1988) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S. Ct. 977, 39 L.Ed.2d 225 (1974)). "Further, the necessity requirement protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *United States v. Rice,* 478 F.3d 704, 710 (6th Cir. 2007) (quoting *United States v. Giordano*, 416 U.S. 505, 515, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974)).

In establishing the necessity of the tap, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163 (citation omitted). Instead, "all that is required is that the investigators gave serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Id*. at 163-64 (citation and quotation marks omitted).

In *Rice*, the court affirmed the district court's finding that there was insufficient credible evidence that other investigative methods had been considered. The district court had determined that the explanations offered for not attempting certain techniques were merely pro forma recitations of the general shortcomings of each technique, and that the statements regarding physical surveillance were made recklessly inasmuch as they suggested that such a technique had been attempted when it had not. Stripping away the misleading information, the district court determined that the affidavit merely offered generalized and uncorroborated information about why certain techniques

would not work, and did nothing more than establish that the confidential source was unable to penetrate the drug conspiracy, and the pen registers revealed a possible connection between the defendant and others with histories of drug-related arrests. The Sixth Circuit found that the district court did not err in concluding that the affidavit did not provide "'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" 478 F.3d at 711 (quoting *Stewart*, 306 F.3d at 304).

Like the affidavit in *Rice*, DeJournett claims that the present affidavits merely offer conclusory statements on why certain techniques are not likely to succeed, relying simply on the inherent shortcomings of various other forms of investigation without tying these shortcomings to the facts of the present case. He also notes that other methods, such as controlled telephone calls and drug purchases, covert surveillance, pen registers, and trap and trace devices, were used with success. He further insists that the government made no showing that normal investigative techniques were too dangerous to employ.

The government responds by noting that each affidavit gave a lengthy and thorough discussion of why alternative methods of investigation had been attempted and failed, why continued use of certain previously successful techniques was not likely to continue to yield results, or why certain untried techniques were unlikely to succeed. Indeed, the initial affidavit noted the past use of confidential informants, search warrants, trash pulls, surveillance, pen registers, confidential sources, consensual monitoring, trap and trace, and the relative success of each technique.

For example, with respect to the use of confidential informants, the March 14, 2013 affidavit noted that while CS-1, CS-2, and CS-3 had provided "mostly historical information about certain members" of the drug organization, they were "no longer assisting law enforcement." (March 14, 2013 Affidavit ¶ 102.) The affidavit provided that other confidential informants (CS-4, CS-5, CS-6, CS-7, and CS-8) lacked "direct knowledge, or a direct line of communication with the hierarchy" such that their information was not likely to advance the investigation. (*Id*. ¶ 103.) In fact, the affidavit stated that "none of the CSs are in a highly trusted position, and are not privy to [information relating to who is supplying the drugs]." (*Id*. ¶ 104.) The fact that these informants were not placed sufficiently high enough in the organization to provide useful information (most notably the source of the drugs) demonstrated the shortcomings of this particular investigatory technique as to this particular investigation. *See United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir. 2000) (fact that informant's access to information was limited sufficient to demonstrate need for wiretaps); *see also Alfano*, 838 F.2d at 164 (necessity for wiretap shown though government failed to exploit use of informants or visual surveillance because large, close-knit crime family immune to normal techniques).

The affidavits also recount the past success of various other techniques, but explain why such techniques are likely to yield diminishing returns. For example, while noting investigators had been able to participate in controlled drug buys in the past, the affidavit emphasizes that this technique "only permits prosecution of the persons from whom the drugs are purchased. While this obviously has some value, it falls short of developing the type of evidence needed to attack and dismantle the overall organization—especially the suppliers and local customer base." (March 14, 2013

Affidavit ¶ 106.) The "mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305. In fact, the government must have experienced some amount of success with non-wiretap techniques in order to establish probable cause. Moreover, the affidavit noted the potential danger of attempting to insert new individuals into the drug organization, underscoring the problem with "turf wars" taking place in Akron. (March 14, 2013 Affidavit ¶ 109-10.)

Defendant DeJournett also complains the government did not employ other, less intrusive, investigative techniques, such as surveillance and grand jury investigation. With respect to the use of the grand jury, the affiant states that if subjects of the investigation were called to testify they "would be placed on actual notice of law enforcement efforts and would likely take additional precautions, thereby making normal investigative techniques even less effective." (March 14, 2013 Affidavit ¶ 117.) *See Bennett*, 219 F.3d at 1122 (in finding sufficient justification for wiretaps, court gave credence to law enforcement concerns that suspect interviews, grand jury subpoenas, and search warrants would "alert the suspects to the ongoing investigation"). The affiant also discussed the possible use of a "pole camera," as a form of fixed surveillance but discounted such a technique because the times and locations of the meetings would not be known in advance and because one of the key figures had "been linked to multiple residences and has shown he also conducts his narcotics transactions away from his primary residence[.]" (March 14, 2013 Affidavit ¶ 128.) These factual allegations go beyond mere recitations of the shortcomings of these investigatory tools, and help demonstrate the need for wiretaps.

"Far from being an initial step," the affidavits describe a lengthy and involved investigation into a vast drug operation wherein a variety of investigatory techniques were utilized before wiretap authorization was sought. *See United States v. Sherrills*, 432 F. App'x 476, 481-82 (6th Cir. 2011) (citing *Rice,* and finding the necessity of wiretaps was established where affidavit set forth the details regarding a seven month drug investigation involving the use of a variety of investigatory techniques, and the limitations associated with a continued reliance on these methods). Indeed, numerous less intrusive methods were employed with varying success. The affidavits document these past successes and specific shortcomings, and demonstrate why wiretaps were necessary to advance the investigation. In short, the affidavits establish the necessity of using wiretaps.

In his final argument, defendant DeJournett claims that the government "manufactured" necessity through an expansive investigative goal. Under the heading of "Objectives of the Investigation[,]" the March 14, 2013 Affidavit provides that:

> The overall objective of the requested court authorization to intercept certain wire communications over TT-1, TT-2 and TT-3 is to: (1) discover the identities and communication facilities used by the drug associates of GARLAND V. PHELPS JR., with a primary emphasis being focused not only on his narcotics suppliers but his local distribution network; (2) uncover the modus operandi of the DTO [drug trafficking organization]; and (3) gain evidence to prove the connection, participation, and role of all the co-conspirators in the criminal activity—in a concerted effort to completely dismantle the DTO of which he is a part.

(March 14, 2013 Affidavit ¶ 18 [all emphasis and capitalization in original].)[18]

The goal of learning the inner workings of an extensive drug organization is a common stated purpose of such investigations. As the court in *Dickerson*, 651 F. Supp. 2d at 742, observed:

> The touchstone for evaluating compliance with [18 U.S.C.] § 2518(1)(c) is the purpose of the investigation. If the purpose simply is to gain evidence against a single individual, and, perhaps, to find him in possession of contraband, surveillance, at least in a drug case, would almost never be justified. Too many other, more direct and less intrusive means exist to gain evidence as to one person.
>
> But in this case, as in most, if not all cases involving federal drug investigations, the government's purpose was considerably more than simply apprehending a single individual. Rather, *as is also commonplace where the objective is to uproot and exterminate a drug distribution organization, the agents wanted to learn who was involved, what they were doing, not just with themselves, but with others, how they were doing it and where they were doing it. In addition, the agents desired to connect drugs and individuals, to improve the likelihood of a successful prosecution.*

(emphasis added).

Like the drug investigation in *Dickerson*, the present investigation was properly focused on learning the *who, what, where, and how* of an extensive drug distribution organization so that it ultimately could be dismantled. "This is the objective

---

[18] A similar objective was advanced for intercepting calls over cell phones, including TT-13, which were the subject of the July 30, 2013 application. In the July 30, 2013 supporting affidavit, the affiant stated that:

> The continued objective of this Title III investigation is: (1) to discover the identities and communication facilities used by the drug associates of ALFONSO GOLDEN JR., ALFONZO B. SYKES, AND DIERE R. DEJOURNETT, with a primary emphasis on their narcotics suppliers and distribution networks; (2) to continue to uncover the _modus operandi_ of the various DTOs; and (3) to gain evidence to prove the connection, participation, and role of all the co-conspirators in the criminal activity-in a concerted effort to completely dismantle the DTOs of which the current Target Subjects are a part.

(July 30, 2013 Affidavit ¶ 26 [all emphasis and capitalization in original].)

in most, if not all federal drug cases involving Title III applications and orders."
*Dickerson*, 651 F. Supp. 2d at 742. There is simply no evidence that the government's
stated purpose in seeking Title III wiretaps was exaggerated in an attempt to justify the
use of wiretaps. DeJournett's suggestion to the contrary is not persuasive, and his reliance
on *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001) is misplaced. In *Blackmon*,
the court set forth its reasons for suppressing the wiretaps as such:

> We conclude wiretap evidence against Blackmon derived from the wiretap
> should be suppressed for two interrelated reasons. First, the application,
> which is nearly a carbon copy of a previous application for a different
> suspect, contains material misstatements and omissions regarding the
> necessity for the wiretap. Second, purged of the material misstatements
> and omissions, the application contains only generalized statements that
> would be true of any narcotics investigation. It is bereft of specific facts to
> satisfy the requirements of § 2518(1)(c).

*Id*. at 1208.

While the court noted that the deficiencies in the application and affidavit
could not be cured "simply because the government claims a vast investigative
purpose[,]" the intercepted calls were suppressed due to misstatements and omissions and
generalized statements as to the adequacy or deficiency of various investigative
techniques. *Id*. at 1211. DeJournett has not alleged that any of the affidavits contain any
misstatements or material omissions, and while he has posited that the affidavits contain
generalized statements, there is clearly sufficiently particularized detail to justify the
wiretaps. Therefore, his motion to suppress the wiretap communications intercepted by
the FBI, as well as the suppression of all information derived therefrom, is denied. For all
of the same reasons, defendant Noel's motion to suppress the writetaps is also denied.

**C. The Government's Motion to Qualify An Expert on Drug Trafficking (Doc. No. 112)**

The government has moved to qualify DEA S.A. Daniel Wehrmeyer as an expert witness on drug trafficking. In response, both Noel and Turner have sought leave to retain their own expert witness.[19] (Doc. Nos. 113 and 115, respectively.) At the conclusion of the June 27, 2014 motion hearing, the Court announced that it would grant the government's motion.[20] The Court will now expound upon that ruling.

Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the trial court to be a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed.

---

[19] Both Noel and Turner also requested a *Daubert* hearing. Because the Court finds that it can make the necessary initial assessment of the relevance and reliability of the proposed expert testimony without a hearing, the request of Noel and Turner for a *Daubert* hearing is denied. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) ("Although the trial court is not required to hold an actual hearing to comply with *Daubert*, the court is required to make an initial assessment of the relevance and reliability of the expert testimony."); *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L.Ed. 2d 238 (1999) (the law grants a district court broad latitude when it decides *how* to determine the reliability of an expert's testimony) (emphasis in original).

[20] The Court also announced that it would deny the motions of Noel and Turner.

2d 238 (1999), the Supreme Court clarified that the "gatekeeping obligation" is not limited to "scientific" expert testimony, but extends to all expert testimony. "Although the trial court is not required to hold an actual hearing to comply with *Daubert*, the court is required to make an initial assessment of the relevance and reliability of the expert testimony." *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999).

The Sixth Circuit has broadly applied the *Daubert* standard to all evidence under Rule 702, including law enforcement agents testifying as experts on drug trafficking, *United States v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006), and has consistently "found police officers' expert testimony admissible where it will aid the jury's understanding of an area, *such as drug dealing*, not within the experience of the average juror." *United Sates v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996) (emphasis added); *see United States v. Jemison*, 310 F. App'x 866, 875 (6th Cir. 2009); *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007) ("Courts generally have permitted police offers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable.") (citation omitted).

Notwithstanding the defendants' generalized attacks upon the government's proposed expert, the record supports a finding that S.A. Wehrmeyer should be qualified as an expert without a hearing. Wehrmeyer has 17 years of experience as a DEA agent, and has considerable experience investigating organized drug activity. He is expected to testify as to the structure of the drug enterprise, the meaning of intercepted words and jargon as a "code", and the methods and means used to conduct the illegal enterprise—all matters that are relevant to this drug conspiracy case and are beyond the experience of the average juror. Therefore, the Court finds that, at this stage, S.A.

Wehrmeyer's proposed expert testimony will be both relevant and reliable.[21]

### D. Conclusion

For all of the foregoing reasons, in Case No. 5:13CR513, the motions of DeJournett and Noel to suppress the intercepted communications, and DeJournett's motion to suppress evidence seized during the government's searches are denied. The government's motion to qualify DEA S.A. Daniel Wehrmeyer as an expert on drug trafficking is granted for the reasons set forth herein and on the record at the June 27, 2014 motion hearing. In Case No. 5:14CR163, defendant Turner's motion to suppress is denied.

**IT IS SO ORDERED**.

Dated: July 29, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[21] At the hearing, counsel for the government represented that the government will, in a timely fashion as set forth in Rule 16, supply defendants with a written summary of S.A. Wehrmeyer's expect testimony. *See* Fed. R. Crim. P. 16(a)(1)(G) ("At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.") Should the summary include testimony that exceeds that represented by the government in its motion to qualify its expert, defendants shall have leave to renew their objections to S.A. Weyrmeyer's testimony.